## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA ATHENS DIVISION

LAURA MCCARTY AND BOBBY J.          :
MCCARTY,                             :
                                     :
     Plaintiffs,                     :
                                     :        No. 3:21-CV-74 (CAR)
v.                                   :
                                     :
LM GENERAL INSURANCE                 :
COMPANY,                             :
                                     :
     Defendant.                      :
_____     :

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Laura McCarty ("McCarty") and Bobby McCarty (collectively "the McCartys") bring claims for breach of contract and bad faith arising out of LM General Insurance Company's ("LM") partial denial of coverage for their claim. Currently before the Court is Defendant LM's Motion for Summary Judgment [Doc. 34]. Having considered the record, the parties' briefs, and applicable law, the Court **GRANTS** LM's Motion.

### BACKGROUND

LM issued the McCartys a homeowners insurance policy—policy no. H3S25129544370 (the "Policy")—effective from December 1, 2019 to December 1, 2020.[1]

---

[1] *See* LM Policy No. H3S25129544370 ("Policy"), [Doc. 45-1].

The Policy provided coverage for the McCartys' dwelling and personal property located at 49 Marsh Lane, Hartwell, GA 30643 (the "Property").[2]

Relevant terms of the Policy are as follows: The Policy, via the Amendatory Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus Endorsement (the "Endorsement"), provides up to $8,360 in coverage for remediation of "Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus" resulting directly from any covered loss.[3] "'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' means any type or form of fungus, rot, virus or bacteria. This includes mold, mildew and any mycotoxins (meaning a toxin produced by a fungus), other microbes, spores, scents or byproducts produced or released by mold, mildew, fungus, rot, bacteria, or viruses."[4]

The Policy defines remediation as "the reasonable and necessary treatment, containment, decontamination, removal or disposal of 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' as required to complete the repair or replacement of property."[5] Remediation also includes "[t]he reasonable costs or expense to remove, repair, restore, and replace that property including the costs to tear out and replace any part of the building as needed to gain access to the 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,'" "the reasonable costs or expense for the testing or investigation necessary to

---

[2] *Id*. at p. 3.
[3] *Id*. at p. 4, 27.
[4] *Id*. at p. 27.
[5] *Id*.

detect, evaluate or measure 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus'"; and "any loss of fair rental value, or reasonable increase in additional living expenses, that is necessary to maintain your normal standard of living, if 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' resulting directly from any covered loss makes your residence premises uninhabitable."[6]

The Policy states LM "will pay no more than the Basic Policy Limits or Option shown in the Declarations for the 'Remediation' of 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' resulting directly from any covered loss during the policy period, regardless of […] the number of losses or claims made."[7] "If there is a covered loss or damage to covered property, not caused, in whole or in part, by 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,' loss payment will not be limited by the terms of this Additional Coverage, except to the extent that 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage."[8] But "[e]xcept as provided by Additional Coverage 11., loss consisting of or caused by 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' is excluded, even if resulting from a peril insured against under Section I. We do not cover 'Remediation' of 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,' even if resulting

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

from a peril insured against under Section I, except as provided by Additional Coverage 11."[9]

An abbreviated timeline of events forming the basis of the McCartys' claim is as follows. During the months of August and September of 2020, McCarty was traveling for work and asked her son—Robert Babcock ("Babcock")—to routinely check on the property.[10] On August 18, 2020, Babcock noticed the house was much warmer than usual and notified McCarty that there was something wrong with the air conditioner.[11] McCarty contacted two AC repair technicians, and the second technician concluded an apparent infestation of opossums damaged the Property's ductwork system.[12] McCarty contacted LM on August 25, 2020, to file the claim at the center of this dispute.[13] Both LM and the McCartys employed third parties to investigate and assess the claim. LM retained Paul Davis Restorations, HVACi, and Jared Powell of Donan Engineering to investigate the Property on its behalf.[14] The McCartys hired Arrow Exterminators, ServPro, Scott Coffman, and Joshua Freidman.[15]

ServPro reported cool air emanating from the open duct work, and the humidity levels at the time, created moisture that saturated the insulation and caused standing

---

[9] *Id*. at p. 28.
[10] Deposition of Laura McCarty ("McCarty Depo."), [Doc. 34-3] at 26:14-27:7; 67:18-68:4.
[11] *Id*. at 68:5-12.
[12] *Id*. at 69:13-25.
[13] *Id*. at 73:13-24.
[14] Affidavit of Lucas Ledbetter ("Ledbetter Aff."), [Doc. 34-8]; Affidavit of Jared Powell, [Doc. 34-9].
[15] Ledbetter Aff. [Doc. 34-8] at p. 3-4; McCarty Depo. [Doc. 34-3] at 77:3-19, 83:5-13.

water but found no leak.[16] LM accepted coverage of the McCartys' claim for damage caused by opossums and initially estimated the replacement cost to be $12,282.09.[17] LM sent the McCartys' a payment of $4,721.29—based on the estimated replacement cost less $5,060.80 in recoverable depreciation and the McCartys' $2,500.00 deductible.[18] LM later reimbursed the McCartys $2,500.00 for their deductible and $250.00 for a clerical error.[19] On September 14, 2020, LM sent McCarty and ServPro employee William Harloe an email stating "[y]ou can proceed with the water and mold mitigation in the crawl space. The remaining mold limit is $8,110.00."[20]

In the event of a covered loss, the Policy provides two conditions for payment. The Policy states the "[l]oss will be payable within 60 days after [LM] receive[s] your proof of loss" and: (a) LM reaches an agreement with the insured, (b) a final entry of judgement is entered, or (c) there is a filing of an appraisal award with LM.[21] On November 9, 2020, the McCartys submitted a sworn statement of loss which included a demand for payment in the amount of $197,149.69.[22] The demand amount reflects the estimate prepared by the McCartys' public insurance adjuster, Joshua Freidman ("Freidman").[23]

---

[16] McCarty Depo., Exhibit 7, [Doc. 34-3] at 86:1-87:13.
[17] Ledbetter Aff., [Doc. 34-8] at p. 3; Deposition of Lucas Ledbetter Vol. II ("Ledbetter Depo."), [Doc. 34-7] at 13:2-15:1.
[18] McCarty Depo., Exhibit 7, [Doc. 34-3] at p. 84-86.
[19] Ledbetter Depo. Vol. I, [Doc. 34-7] at 93:17-94:18.
[20] McCarty Depo., Exhibit 9, [Doc. 34-3] at p. 95-96; 97:19-108-6.
[21] Policy, [Doc. 45-1] at p. 18.
[22] *See* McCarty Demand, [Doc. 34-3] at p. 106; Sworn Statement of Loss, [Doc. 34-3] at p. 105.
[23] *See generally*, Deposition of Joshua Friedman ("Friedman Depo."), [Doc 45-7].

The McCartys' engineering expert, Scott Coffman ("Coffman"), testified that he believed the water damage to the floors was caused by "condensation that had penetrated through the cracks in the subfloor that got to the bottom surface of the finished floor."[24] During his inspection of the home, Coffman did not observe microbial growth on the McCartys' interior walls or personal contents.[25] But he did find microbial growth on the floor joists and subfloor.[26] Addressing the extent of the demanded repairs, Coffman testified:

> Q: And in order to remove the microbial growth that you're talking about, you need to replace the entire floor system in that home?
>
> A: The floor covers -- I believe that you need to take them up so it can be properly treated to make sure that that microbial growth is treated with industrial hygienist properly so that there's no residual microbes floating around there.
>
> Q: Okay. So when you take the -- so you're talking about the entire finished floor covers need to be removed?
>
> A: That's correct.
>
> Q: Even the ones in the kitchen and in the bathroom where we've got linoleum, and even in the areas where there's carpet?
>
> A: Yes. And, again, it's because there's gaps between the subfloor. Those are subfloor planks that are gapped, and that would allow moisture to get up in there. So I believe that's the -- the only way you could get it cleaned properly.[27]

---

[24] Deposition of Scott Coffman ("Coffman Depo."), [Doc. 34-4] at 75:5-19.
[25] *Id*. at 72:20-73:5.
[26] *Id*. at 58:20-25.
[27] *Id*. at 105:2-13.

To date, LM has paid the McCartys $16,146.34—representing the mold limit of $8,360.00 and the actual cash value payments of the covered damage of the damage in the crawlspace.[28] But parties were unable to resolve the additional $197,149.69 in disputed damages claimed by the McCartys. The McCartys filed the present case seeking damages for breach of contract and bad faith. LM moved for summary judgment on both claims. LM's Motion is now ripe for ruling.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[30] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[31]

The Court must view the facts, and any reasonable inferences drawn from those

---

[28] Ledbetter Aff.", [Doc. 34-8] at p. 8.
[29] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[30] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).
[31] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324.

facts, in the light most favorable to the party opposing the motion.[32]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[33]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[34]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[35]  "The court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[36]

## DISCUSSION

The McCartys assert claims for breach of contract and bad faith against LM. LM moved for summary judgment on both claims and contends the McCartys' claim exceeds the Endorsement's remediation limit, and the McCartys' bad faith claim fails as a matter of law. The Court agrees.

---

[32] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[33] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[34] *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[35] *Penley*, 605 F.3d at 848.

[36] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

## I.      Breach of Contract

The McCartys assert a breach of contract claim arising out of LM's alleged wrongful partial denial of coverage. LM contends the McCartys' claim exceeds the Endorsement's limit for the remediation of mold, fungus, wet rot, dry rot, bacteria, or virus.[37] The McCartys argue a genuine dispute of material fact exists as to the existence of covered water damage to the interior of their home resulting from the opossum infestation.[38] The McCartys' contention is without merit.

To prove a claim for breach of contract, a plaintiff must show (1) a valid contract, (2) a material breach of its terms, and (3) resultant damages to the party who has the right to complain about the breached contract.[39] Here, the McCartys cannot show LM breached the terms of the Policy. Under Georgia law, "contracts of insurance are interpreted by ordinary rules of contract construction."[40] "Georgia law directs courts interpreting insurance policies to ascertain the intention of the parties by examining the contract as a whole."[41] Courts must first consider "the ordinary and legal meaning of the words employed in the insurance contract."[42] "[P]arties to the contract of insurance are bound

---

[37] LM's Motion for Summary Judgment, [Doc. 34].

[38] McCartys' Response, [Doc. 45] at p. 1-2.

[39] *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1130 (11th Cir. 2014).

[40] *Progressive Mt. Ins. Co. v. Madd Transp., LLC*, 633 F. App'x 744, 746 (11th Cir. 2015) (quoting *Lavoi Corp. v. Nat'l Fire Ins. of Hartford*, 293 Ga. App. 142 (2008)).

[41] *Alea London Ltd. v. Am. Home Servs.*, 638 F.3d 768, 773 (11th Cir. 2011) (citing *Ryan v. State Farm Mut. Auto. Ins. Co.*, 261 Ga. 869, 872 (1992)).

[42] *Id*.

9

by its plain and unambiguous terms."[43] "If the terms of the contract are plain and

unambiguous, the contract must be enforced as written."[44] Any "ambiguities are

construed against the drafter of the contract (i.e., the insurer), and in favor of the

insured."[45] But "it is well-settled under Georgia law that courts may not look beyond the

text of an insurance policy and apply canons of construction absent a finding of

ambiguity."[46] Here, the Court finds no such ambiguity and is bound to enforce the terms

of the Policy as written.

The Policy, via the Endorsement, provides up to $8,360 in coverage for

remediation of "Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus" resulting directly

from any covered loss.[47] The Policy defines "Remediation" as:

> "Remediation" means the reasonable and necessary treatment,
> containment, decontamination, removal or disposal of "Mold, Fungus, Wet
> Rot, Dry Rot, Bacteria, or Virus" as required to complete the repair or
> replacement of property, covered under Section I of the policy, that is
> damaged by any covered peril insured against, and also consists of the
> following: 1. The reasonable costs or expense to remove, repair, restore, and
> replace that property including the costs to tear out and replace any part of
> the building as needed to gain access to the "Mold, Fungus, Wet Rot, Dry
> Rot, Bacteria, or Virus"; and 2. the reasonable costs or expense for the
> testing or investigation necessary to detect, evaluate or measure "Mold,
> Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"; and 3. any loss of fair rental
> value, or reasonable increase in additional living expenses, that is necessary
> to maintain your normal standard of living, if "Mold, Fungus, Wet Rot, Dry

---

[43] *Id.* (citing *Peachtree Cas. Ins. Co. v. Kim*, 236 Ga. App. 689, 690 (1999)).

[44] *Id.* (citing *Ryan*, 261 Ga. at 872).

[45] *Duckworth v. Allianz Life Ins. Co. of N. Am.*, 706 F.3d 1338, 1342 (11th Cir. 2013) (citing *Alea*, 638 F.3d 768).

[46] *Id.*

[47] Policy, [Doc. 45-1] at p. 4, 27.

Rot, Bacteria, or Virus" resulting directly from any covered loss makes your residence premises uninhabitable.[48]

The parties do not dispute LM paid the McCartys the full $8,360 allotted under the Endorsement.[49] The crux of the parties' dispute concerns whether the claimed loss is subject to the Endorsement's $8,360 coverage limit for remediation or whether it is covered under another portion of the Policy.

The Policy states LM "will pay no more than the Basic Policy Limits or Option shown in the Declarations for the 'Remediation' of 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' resulting directly from any covered loss during the policy period, regardless of […] the number of losses or claims made."[50] "If there is a covered loss or damage to covered property, not caused, in whole or in part, by 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,' loss payment will not be limited by the terms of this Additional Coverage, except to the extent that 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage."[51]

Under the terms of the Endorsement, the McCartys' claim is subject to the remediation coverage limitations. Scott Coffman—the McCartys' own expert—testified as follows:

---

[48] *Id*. at p. 27.
[49] *See* Ledbetter Aff., [Doc. 34-8]; Ledbetter Depo. Vol II., [Doc. 34-7] at 9:3-12:16.
[50] Policy, [Doc. 45-1] at p. 27.
[51] *Id*.

Q: And in order to remove the microbial growth that you're talking about, you need to replace the entire floor system in that home?

A: The floor covers -- I believe that you need to take them up so it can be properly treated to make sure that that microbial growth is treated with industrial hygienist properly so that there's no residual microbes floating around there.

Q: Okay. So when you take the -- so you're talking about the entire finished floor covers need to be removed?

A: That's correct.[52]

The repairs described in Coffman's testimony fit squarely within the Policy's definition of remediation. "Remediation" of the microbial growth includes "the reasonable and necessary treatment, containment, decontamination, removal or disposal" and "reasonable costs or expense to remove, repair, restore, and replace that property including the costs to tear out and replace any part of the building as needed to gain access." Both the removal of the floor covers to access the microbial growth, and the treatment of the microbial growth, are remediation under the terms of the Policy and thus, are subject to the Endorsement's remediation coverage limit.

The McCartys contend the efficient proximate cause doctrine provides for coverage despite the terms of the Policy's mold exclusion and the Endorsement. The Court disagrees. The efficient proximate cause doctrine "applies when two or more identifiable causes contribute to a single property loss -- at least one of them covered under the policy and at least one of them excluded under the policy."[53] But Georgia law

---

[52] Coffman Depo., [Doc. 45-3] at 105:2-13.
[53] *Burgess v. Allstate Ins. Co.*, 334 F. Supp. 2d 1351, 1360 (N.D. Ga. 2003).

instructs Courts to "analyze the contract as a whole and interpret it to give the greatest effect possible to all provisions and avoid rendering any provisions meaningless."[54] The Endorsement provides a critical qualifying exclusion:

> Except as provided by Additional Coverage 11., loss consisting of or caused by 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus' is excluded, even if resulting from a peril insured against under Section I. **We do not cover 'Remediation' of 'Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,' even if resulting from a peril insured against under Section I, except as provided by Additional Coverage 11.**[55]

The terms of the Endorsement's exclusion are plain and unambiguous. LM will not cover remediation of mold, fungus, wet rot, dry rot, bacteria, or virus, even if resulting from a peril insured against under Section I, except as provided by in the Endorsement. Because there is no ambiguity, the Court is bound to enforce the Policy's terms as written and concludes the terms defeat the McCartys' efficient proximate cause argument. Thus, even if the underlying damage to the McCartys' floor resulted from a covered loss, the McCartys' claim would nevertheless be subject to the Endorsement's $8,360 remediation limitation. Having already paid the Endorsement's entire $8,360 remediation limit, LM issued a valid partial denial of coverage due to the claim exceeding the Endorsement's limits. Therefore, the McCartys' breach of contract claim fails, and LM is entitled to summary judgment.

---

[54] *Bennett Int'l Grp., LLC v. Allied World Specialty Ins. Co.*, No. 1:21-cv-2190-MLB, 2022 U.S. Dist. LEXIS 4633, at *12 (N.D. Ga. Jan. 10, 2022) (citing *Young v. Stump*, 294 Ga. App. 351 (2008)); *see e.g. Empire Indem. Ins. Co. v. Winsett*, 325 F. App'x 849, 851 (11th Cir. 2009) ("the efficient cause doctrine cannot be incorporated into an insurance policy if doing so would render part of the policy meaningless").
[55] Policy, [Doc. 45-1] at p. 28 (emphasis added).

## II.     Bad Faith

The McCartys contend LM wrongfully denied coverage under the Policy in bad faith and seek penalties and attorney's fees under O.C.G.A § 33-4-6 (the "bad faith statute"). LM argues the McCartys are not entitled to damages for bad faith because they failed to make a timely demand under the bad faith statute, and LM's partial denial of coverage was based on a reasonable interpretation of the Policy and the opinions of independent experts.

Georgia's bad faith statute provides policyholders with a civil remedy when an insurer refuses, in bad faith, to pay a valid claim. The bad faith statute states:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.[56]

Stated differently, "[a]n insurance company is liable for penalties under OCGA § 33-4-6 when it fails to pay a covered loss within 60 days after a demand for payment has been made and there has been a finding that the refusal to pay was in bad faith. The purpose of the section is to penalize insurers that delay payments without good cause."[57] As

---

[56] O.C.G.A § 33-4-6(a).
[57] *Cagle v. State Farm Fire & Cas. Co.*, 236 Ga. App. 726 (1999) (citations omitted).

14

discussed above, the McCartys' loss exceeded the remediation coverage limit provided in the Endorsement, and the Policy supported LM's partial denial of coverage.

The McCartys' demand for payment was also premature. In *Cagle*, the Georgia Court of Appeals summarized the bad faith statute's requirements: "As the section imposes a penalty, it is strictly construed; consequently, a proper demand for payment is essential to recovery. In this sense, a demand for payment must be made when immediate payment is in order."[58] Likewise, "[a]n insured cannot legally demand immediate payment 'if the insurer has additional time left under the terms of the insurance policy in which to investigate or adjust the loss.'"[59]

The Policy states in the event of a covered loss, the loss will be payable (1) "within 60 days after [LM] receive[s] your proof of loss" and (2) LM reaches an agreement with the insured, a final entry of judgement is entered, or there is a filing of an appraisal award with LM.[60] On November 9, 2020, the McCartys submitted a sworn statement of loss which included a demand for payment in the amount of $197,149.69.[61] But under the terms of the Policy, payment was not immediately due.  LM certainly had not reached an agreement with the McCartys, no final entry of judgement was entered, and no appraisal award was filed with LM. Additionally, the Policy provided 60 days for LM to issue

---

[58] *Id.* at 727.
[59] *Stedman v. Cotton States Ins. Co.*, 254 Ga. App. 325, 327 (2002) (citation omitted).
[60] Policy, [Doc. 45-1] at p. 18.
[61] *See* McCarty Demand, [Doc. 34-3] at p. 106; Sworn Statement of Loss, [Doc. 34-3] at p. 105.

payment once it received the McCartys' proof of loss.[62] Thus, the demand was premature under both terms of payment. Because LM's partial denial of coverage was supported by the Endorsement and the McCartys' demand for payment was premature, the McCartys' bad faith claim fails.

## CONCLUSION

Based on the forgoing reasons, LM is entitled to summary judgment on the McCartys' claims. LM's Motion for Summary Judgment [Doc. 34] is **GRANTED.**

**SO ORDERED,** this 31st day of March, 2023.

s/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[62] The Court finds the McCartys' contention that LM waived the proof of loss requirement under the Policy unpersuasive and non-outcome determinative, as the other preconditions of payment had not been satisfied, and the Policy supported LM's partial denial of coverage.